**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MONICA VAUGHAN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:13-CV-2924-BH** |
| | § | |
| **CAROLYN COLVIN, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the consent of the parties and the order of transfer dated October 22, 2013, this case has been transferred for all further proceedings and entry of judgment.  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I.   BACKGROUND

### A.   Procedural History

Monica Anne Vaughan (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act and her claim for supplemental security income (SSI) under Title XVI of the Social Security Act.  (doc. 21 .)  On July 25, 2011, Plaintiff applied for DIB and SSI, alleging disability beginning on January 1, 2008, due to depression and anxiety. (R. at 144-149, 150-159.)  Her application was denied initially and upon reconsideration.  (R. at 66-71, 76-79.) She timely requested a hearing before an Administrative Law Judge (ALJ), and she personally appeared and testified at a hearing on January 9, 2013. (R. at 84-85, 30-61.)  On January 31, 2011, the ALJ issued her decision finding Plaintiff not disabled.  (R. at 25.)  The Appeals Council denied

her request for review on May 20, 2013, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-4.)  She timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  (doc. 1.)

**B.**   <u>Factual History</u>

    **1.**   **Age, Education, and Work Experience**

Plaintiff was born on August 9, 1966, and she was 46 years old at the time of the hearing before the ALJ.  (R. at 34, 144, 152.)  She got her GED and has past relevant work  as a financial aid counselor and an assistant manger of an apartment complex.  (R. at 58.)

    **2.**   **Psychological and Psychiatric Evidence**[1]

On July 28, 2009, Plaintiff presented to Parkland Health & Hospital Systems's deHaro-Saldivar Health Center (deHaro) as a new patient, complaining of a headache as well as stress and anxiety.  (R. at 257-58.)  A review of her symptoms indicated that she was positive for depression, and a physical examination revealed that she was alert and oriented, and her mood, affect, behavior, and thought content were normal.  (R. at 258-59.)  Dr. Maria Robinson diagnosed her with depressive disorder and cluster headaches.  (R. at 259.)  She referred Plaintiff to "psychiatry" and instructed her to continue her current medications of Celexa and Midrin as prescribed.  (R. at 260.)  Plaintiff visited deHaro's social work department on August 18, 2009, due to "[a]lleged domestic v[i]olence."  (R. at 281.)  Jennifer Godinez noted that Plaintiff had a history of mental illness and was currently being treated for it.  (R. at 282.)  Plaintiff was diagnosed with depression, reporting symptoms of "lack of interest" and changes in "sleep and eating."  (*Id*.)  She denied suicidal and homicidal ideations.  (*Id*.)  Ms. Godinez counseled Plaintiff on depression, its symptoms, and

---

      [1]Because Plaintiff has not alleged a physical disability, a recitation of the physical medical evidence is unnecessary.

treatment options.  (R. at 283.)  She also explored with Plaintiff ways that she could manage her stress.  (*Id*.)  According to Ms. Godinez, Plaintiff's strengths were that she presented appropriately dressed and groomed, her speech and affect were appropriate, her mood was normal, and her thought process was intact.  (*Id*.)  Plaintiff was also able to get out of her violent relationship.  (*Id*.)

On November 17, 2010, Plaintiff presented to Irving Interfaith Clinic as a new patient and requested lab work for Hepatitis C & B.  (R. at 293-294.)  The doctor noted that she had previously been on antidepressants, and last took one three months before.  (R. at 293.)  Prozac made her gain weight and increased her sleepiness and anxiety.  (*Id*.)  The doctor prescribed Elavil for her depression and anxiety.  (*Id*.)

On February 15, 2011, Plaintiff returned to Irving Interfaith Clinic, complaining of fatigue, inability to sleep or eat well, tooth pain, and hallucinations.  (R. at 290-91.)  The examining doctor noted that she had a medical history of depression with side effects of fatigue and a lack of self care, and that domestic violence was a life stressor for her.  (*Id*.)  She assessed that Plaintiff suffered from depression and tooth pain.  (*Id*.)  Plaintiff denied suicide ideations.  (*Id*.)

On July 21, 2011, Plaintiff presented to Metrocare Services (Metrocare) for a "psychiatric diagnostic interview exam."  (R. at 305-307.)  Her chief complaint was that "[she] felt [she] need[ed] assistance in dealing with [life] issues."  (R. at 306.)  She reported that she had been dealing with depression for as long as she could remember, and she reported one suicide attempt at the age of sixteen.  (*Id*.)   She also reported a history of sad mood, anhedonia, poor sleep, low energy, low appetite, mood swings, irritability, and racing thoughts.  (*Id*.)  She denied a history of manic episodes and paranoia.  (*Id*.)  Kevin Johnson, a Metrocare physician assistant (PA), noted that her history of depressive symptoms was "most consistent" with major depressive disorder.  (R. at 307.)

3

He also noted that she had not taken her "psych meds" in three days.  (*Id*.)

That same day, she met with Kadie Tabor, a Metrocare caseworker, to discuss her goals for a 90-day mental health treatment plan and to discuss psychosocial rehabilitation.  (R. at 308-309.) Plaintiff conveyed that she wanted to "obtain a job," "pay bills," and "buy a car in the future."  (R. at 308.)  Her objectives were to learn about mental illness, symptomology, and medication management as well as learn healthy coping and relational skills to improve her ability to handle stress, develop supportive relationships, develop functionality, and reduce conflicts.  (R. at 309.) Ms. Tabor put her in contact with the Texas Department of Assistive and Rehabilitative Services. (*Id*.)  She noted that Plaintiff was diagnosed with major depressive disorder and needed assistance with employment.  (*Id*.)

On July 28, 2011, Plaintiff saw Maria Wilson, a nurse at Metrocare, and complained of nausea, "feeling tired," and  "feeling sad."  (R. at 310.)  She told Ms. Wilson that she isolated herself and preferred no communications with others because she thought they had an ulterior motive, and she feared them.  (*Id*.)  The nurse made a notation of "paranoid - I'm guarded."  (*Id*.)  Plaintiff asked to stay on her same medication since she had just started on it, and she told the nurse she would "call/return/seek help" if her nausea did not stop.  (*Id*.)

On September 7, 2011, Plaintiff returned to Metrocare for a counseling session with Metrocare clinician Katherine Guenther.  (R. at 423.)   Plaintiff learned the etiology of mental illness, typical symptoms, and why counseling could be helpful for her mental well-being as well as to help her prepare for employment.  (*Id*.)  She complained of "sleeping too much, feeling down, and crying."  (*Id*.)  She reported that she had a hard time remembering things, so she counted her pills everyday to make sure she took the right amount.  (*Id*.)

4

On September 20, 2011, a state agency medical consultant (SAMC) completed a Psychiatric Review Technique (PRT) form. (R. at 313-326.) The SAMC noted that Plaintiff had mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. at 323.) He found that Plaintiff had medically determinable impairments of depression and anxiety that did not precisely satisfy the requirements for an affective disorder under the listings in section 12.04 of 20 C.P.R. Part 404, Subpart P, Appendix 1 and for an anxiety-related disorder under section 12.06 of the listings, respectively. (R. at 316, 318.) The consultant's notes associated with the PRT paralleled the notes from Plaintiff's July 21, 2011 session at Metrocare. (R. at 325.) He also noted that Plaintiff had issues with "med compliance" as well as sadness, fatigue, isolation, and paranoia. (*Id.*)

The SAMC also completed a Mental Residual Functional Capacity Assessment (MRFCA) on September 20, 2011. (R. at 327-330.) He found Plaintiff not significantly limited to markedly limited in various aspects of understanding and memory and sustained concentration and persistence. (*Id.* at 328-29.) She was not significantly limited to moderately limited in various aspects of social interaction and adaptation. (R. at 329.) He assessed Plaintiff's functional capacity as follows: "Plaintiff retains capacity to understand and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, accept instructions and respond appropriately to changes in routine work settings." (*Id.* at 329.) He noted that her alleged limitations from her symptoms were not fully supported by the available evidence of record. (*Id.*)

On September 22, 2011, Plaintiff returned to Metrocare for a "pharmacological management" routine follow-up. (R. at 424.) Mr. Johnson noted that Plaintiff was well-groomed,

cooperative, her speech was normal, her thoughts were organized, her psychomotor behavior was normal, her affect was euthymic, she was "[o]riented x4," her insight and judgment were fair, and her memory was intact.  (*Id*.)  Plaintiff reported that she was not doing well - she had excessive bleeding, recent panic attacks, and chest pressure.  (R. at 425.)  Her first recent panic attack was severe, but "she cope[d] well with it."  (*Id*.)  She also reported a "sad mood" and crying spells.  (*Id*.)  Mr. Johnson noted that she had not taken her "psych meds" in three days, and she presented with some pressured speech.  (*Id*.)  She had been taking Paxil and wanted to start back on it, because it moderately aided her symptoms and improved her sleep.  (*Id*.)   Mr. Johnson gave her Depakote for anxiety and pressured speech.  (*Id*.)

On October 24, 2011, Plaintiff had a psychiatric diagnostic interview exam at Metrocare.  (R. at 427.)  She complained that she was "not very good."  (*Id*.)  She reported "sad mood," crying spells, and anger spells.  (R. at 428.)  Mr. Johnson noted that she was adequately groomed, cooperative, her thoughts were normal, her insight and judgment were fair, she was "oriented x4," her psychomotor behavior was normal and her memory was intact, but she felt "down," her affect was hypomanic, and her speech was pressured.  (R. at 427.)  He assessed that in addition to a history of depressive symptoms, she had a history of "mood dysregulation most consistent with Bipolar I, Mixed, without Psychosis."  (R. at 428.)  He noted that she was on a current medication regime of Depakote and Paxil, and she reported that she was feeling "moderately well" lately.  (*Id*.)  She believed the Depakote had been causing some hallucinations.  (*Id*.)  She was compliant with her "psych meds" and continued to present with pressured speech.  (*Id*.)  He gave her Tegretol for

"mania."[2]  (*Id*.)

On November 22, 2011, Dr. Veena Ghai completed a Case Assessment Form for reconsideration of the September 20, 2011 MRFCA.  (R. at 431.)  Based upon all the evidence in the file, Dr. Ghai reaffirmed the MRFCA.  (*Id*.)  Her notes paralleled Mr. Johnson's notes from October 24, 2011.  (*Id*.)  She also noted the following activities of daily living: "simple meals/cleans/laundry, walks, able to go out alone, can shop although it takes longer."  (*Id*.)

Plaintiff returned for another "pharmacological management" routine follow-up on December 6, 2011.  (R. at 455.)  Shauna Reid, Metrocare Psychiatrist, noted that Plaintiff was adequately groomed and cooperative, her behavior was normal, her thoughts organized, her affect euthymic, she was "oriented x4," her memory was intact, and her insight and judgment were fair. (R. at 455-456.) Plaintiff complained that she was not doing well and reported severe anxiety and panic symptoms that kept her from leaving her house.  (R. at 456.)  She also reported mild paranoia, and she was "very tearful."  (*Id*.)  Dr. Reid increased her dosage of Paxil.  (*Id*.)  She noted that "on brief screen could not illicit prior manic episode rather ruminating anxiety so not certain bipolar [diagnosis] is accurate."  (*Id*.)  She noted that there needed to be a new evaluation, and she recommended therapy.  (*Id.*)

That same day, Plaintiff had a counseling session with Metrocare clinician Ross Eason.  (R. at 459.)  Her objective was "[f]or [her] life to be different."  (*Id*.)  Mr. Eason noted that Plaintiff was "oriented x4" and had normal hygiene.  (*Id*.)  Plaintiff agreed to a treatment plan.  (*Id*.)

On January 3, 2012, Plaintiff returned to Metrocare for a brief visit with a nurse. (R. at 460.)

---

[2]Mania is a phase of bipolar disorder associated with an elevated mood and symptoms such as euphoria, inflated self-esteem, poor judgment, and increased physical activity.  Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/bipolar-disorder/basics/symptoms/con-20027544 (1ast visited Sept. 30, 2014).

She reported bad headaches and violent nightmares. (*Id.*) She was not taking "OTC pain relievers." (*Id.*) She also reported environmental stressors of not getting along with her daughter, "court," and "acquaintance committed suicide." (*Id.*) Ms. Wilson noted that she was paranoid, depressed, had poor insight, was excessively worried, but well groomed and cooperative. (*Id.*) She educated Plaintiff on the side effects of her medication. (R. at 461.) Plaintiff also attended a counseling session with Mr. Eason that day. (R. at 462.) She wanted to move because she was not comfortable at her current home. (*Id.*) She thought people were coming into "her place" and that her electricity was being used by someone else. (*Id.*) Mr. Eason educated Plaintiff regarding barriers that could prevent her from finding a new place. (*Id.*)

On January 26, 2012, Melinda Huffman, an advanced practice nurse at Metrocare, noted that Plaintiff did not report a history of mania. (R. at 463.) Plaintiff had a history of depressive symptoms consistent with major depressive disorder with borderline traits. (R. at 464.) Ms. Huffman noted that Plaintiff was well-nourished, cooperative, had normal psychomotor functions, normal speech, and an organized thought process. (R. at 462.) She was "oriented x4," and she had good insight and judgment. (R. at 463.) Ms. Huffman took Plaintiff off of Tegretol to ascertain if it was causing the anergia and fatigue of which Plaintiff complained. (R. at 464.)

On January 31, 2012, Mr. Eason and Marizel Aguilar, her newly-assigned counselor, contacted Plaintiff about attending group cognitive behavioral therapy. (R. at 466-67.) Plaintiff stated that she could not make the group meeting time and that she felt anxious in a group. (R. at 467.) She agreed to schedule her first session for February 8, but failed to attend. (*Id*. at 468.) Despite follow-up phone calls from Metrocare staff, Plaintiff did not reschedule the session. (R. at 469-472.)

On April 16, 2012, Plaintiff presented to Parkland Health & Hospital System (Parkland) complaining of hyperkalemia and depression. (R. at 541.) Dr. Nazia Khatoon noted that she was diagnosed with headache, depressive disorder, anemia, and "anxiety state." (R. at 541-42.) She also noted that she was diagnosed with bipolar disorder at Metrocare in 2011. (R. at 542.) Plaintiff reported that she was not going to Metrocare regularly and needed to talk to someone. (R. at 541.)

On April 25, 2012, Plaintiff walked into Metrocare for a medication refill. (R. at 473-74.) She reported an overall stable mood, and that she was sleeping well and had a normal appetite. (R. at 474.) She also had a routine case management session with Heather Hibbard that same day. (R. at 476.) Ms. Hibbard noted that Plaintiff appeared to be feeling overwhelmed because she wanted to move out of her apartment due to "the crime, the loi[t]ering, and the management." (*Id*.) Ms. Hibbard helped Plaintiff fill out a new food stamp form. (*Id*.)

On June 21, 2012, Plaintiff reported that she had a "lot of depression." (R. at 478-79.) Ms. Huffman transitioned her from Paxil to Effexor for depressive symptoms. (*Id*.) On August 23, 2012, Plaintiff reported that she was still depressed. (R. at 482-83.)

### 3.     Hearing Testimony

On January 9, 2013, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 30-60.) Plaintiff was represented by an attorney. (*See id.*) Plaintiff's attorney stated that Plaintiff suffered from anxiety and depressive disorder, and that she had developed a phobia "in regards to being [around] any other people." (R. at 33.) He represented to the ALJ that his theory of the case was that Plaintiff had "major depressive disorders, anxiety and fear of being around the public, and that this keeps her from being able to hold gainful employment." (*Id*.) When asked if Plaintiff was alleging any physical impairments, the attorney stated, "[j]ust major depressive

disorder is the major one.  She does have some other physical issues, but they're not disabling." (R. at 34.)

### a.      Plaintiff's Testimony

Plaintiff testified that her birthdate was August 9, 1966, and that she was 46 years old.  (R. at 34.)  She had lived alone for the past two years, she had three grown children, and she had a driver's license.  (*Id*.)  She could drive although she did not have a car, and she got around by walking. (R. at 35.)  She earned her GED.  (*Id*.)

Plaintiff's last job was in 2007 as a financial aid counselor at a technical training center.  (R. at 35-36.)  She did that job for approximately 3 years before she was laid off.  (*Id*.)  After that, she looked for any work she was capable of doing mentally.  (*Id*.)  She had a few interviews, and she thought she was offered some jobs but she could not remember.  (*Id*.)  One job "sent [her] for like a drug test" but she did not get the job.  (*Id*.)  She also was never told the result of the drug test.  (*Id*.)  She last looked for a job about a year and half ago.  (*Id*.)  When asked if she thought she would be able to work, she said she could not be around people.  (*Id*.)  She got "extremely upset real easy," and she would try to communicate but could not.  (*Id.*)

She had not drunk alcohol in almost five years.  (R. at 37-38.)  The last time she "tried illegal drugs" was when she was younger.  (*Id*.)  She tried marijuana and may have tried cocaine.  (*Id*.)  About four to five years earlier, she used Zoloft that was not prescribed to her because she was depressed.  (R. at 39.)

She had been smoking since she was nine years old.  (*Id*.)  She had recently cut her smoking down to about a half of a pack a day.  (*Id*.)

At the time of the hearing, she was taking Tegretol and Bupropion, which her doctor wanted

10

her to stop taking.  (*Id.*)  Her doctor prescribed her a new medication, Divalproex, that she was afraid to take because it previously caused her to have severe hallucinations and migraines as well as female bleeding.  (R. at 42.)  She was also taking Hydroxyzine "as-needed" for anxiety.  (R. at 43.)  She did not take it often because when she did, she would "get knocked out...for like four solid hours."  (*Id.*)  However, it "really, really" helped her with her panic attacks.  (*Id.*)  When she had a panic attack, she felt like she could not breath and was going to die.  (*Id.*)  Her chest also started racing.  (*Id.*)  She had to take the medicine "because it [would not] stop if [she did not] take it."  (R. at 44.)

Her medications had been changing so often.  (R. at 45.)  She was told that she had been through every anti-depressant that "they" could offer her.  (R. at 46.)  With every medication, "there's issues behind them," and she went through so many side effects.  (*Id.*)

The Bupropion gave her flu-like symptoms the first two weeks she was on it.  (R. at 45.) She could not remember what she set out to do.  (R. at 46.)  She would "fly off the handle at people," which she did not normally do because she was "not around people."  (R. at 47.)  A couple of weeks before the hearing, she "let loose" on the phone with her sister and said "things that were just terrible, just terrible."  (*Id.*)  She stayed at her sister's home when she started the Bupropion because she was really sick.  (R. at 48.)  Her sister was worried about leaving her at home due to the issues with the medication.  (*Id.*)

She did not see two of her children at all.  (*Id.*)  She rode with her sister to Amarillo, Texas, to attend her daughter's graduation from nursing school.  (R. at 49.)

When asked if she ever tried to commit suicide, she responded that she would not do that to her grandchildren.  (R. at 50.)  Upon inquiry by her counsel, she testified that she found herself

"flying off the handles" with her daughters.  (R. at 52.)  She thought the medicine had a little to do

with it, but she had done that "through [her] life."  (*Id*.)

When asked if she thought she would be able to work around others at that time, she stated

that she was afraid she would say or do the wrong thing and be fired.  (R. at 53.)  She had never been

fired, but there were times when she felt she had to resign because she would be fired if she did not.

(*Id*.)  Her panic attacks occurred "maybe...once every two weeks, but sometimes it's three times a

week."  (*Id*.)  She thought being around other people caused the attacks to be more frequent. (*Id.*)

Her medicines did not make things better for her.  (R. at 54.)  During the day she watched

T.V., but it tended to get on her nerves so she would turn it off.  (*Id*.)  She would occasionally talk

on the phone or play a computer game, and sometimes she just sat and did nothing.  (*Id*.)  She did

not drive because it brought her anxiety level up.  (R. at 55.)  She only went grocery shopping when

she needed something because it was "mass confusion" for her and "like a major ordeal."  (*Id*.)  She

just wandered around and did not remember why she was there.  (*Id*.)

When asked if she would be able to follow instructions on a "job situation," she responded

that she was not able to comprehend.  (R. at 56.)  When she read, she did not absorb, understand,

or comprehend what she read.  (*Id*.)  She did not believe that any employer will, could, or should

have to put up with "constant reiteration," because she would have to do that just to read anything

she wanted to read.  (*Id*.)

There were "paranoia feelings" that she had, but she knew people talked about people and

that did not really bother her.  (R. at 57.)  "It's the fact that I don't – I care about what people think

about me, you know."  (*Id*.)

### b.      VE's Testimony

The VE testified that Plaintiff's past relevant work history was as an assistant manager of an apartment house (light, SVP-5) and a financial aid counselor (sedentary, SVP-5).  (R. at 58.)  The ALJ asked the VE to opine whether a hypothetical person of Plaintiff's age, education, and work experience who had no exertional limitations but who was limited to occupations that require no production rate of pace work, such as production line worker, could perform Plaintiff's past relevant work.  (*Id.*)  The VE testified that production-pace requirements would not necessarily affect Plaintiff's past work.  (*Id.*)

When the hypothetical was modified to incorporate the limitation of only occasional interaction with coworkers, supervisors, and the public, the VE testified that the hypothetical person could not perform Plaintiff's past relevant work but could perform other work, for example a housekeeper (light, SVP-2), with 88,000 jobs nationally, and 6,500 jobs in Texas; a cafeteria attendant (light, SVP-2), with 76,400 jobs nationally, and 4,300 jobs in Texas; and a kitchen helper (medium, SVP-2), with 125,000 jobs nationally and 7,200 jobs in Texas.  (R. at 58-59.)  When the hypothetical was modified to incorporate the limitation of simple, routine or repetitive tasks, the VE testified that the hypothetical person could still perform those jobs.  (*Id.*)  The ALJ modified the hypothetical again to incorporate the limitation of "low-stress jobs defined as requiring only occasional decision making and occasional changes in the work setting," and the VE opined that the hypothetical person could still perform those same jobs.  (*Id.*)

The ALJ added the limitation of isolated work with only occasional supervision, to the extent it was not inconsistent with the limitations on interacting with co-workers, supervisors, and the public.  (R. at 60.)  The VE testified that there would be no work the hypothetical person could

perform in that case.  (*Id*.)  Finally, disregarding the last limitation, the ALJ added the limitation that the hypothetical person would need to be reminded of tasks two to three times per day.  (*Id*.)  The VE testified that there would be no work the hypothetical person could perform in that case.  (*Id*.)

## C.    **ALJ's Findings**

The ALJ issued her decision denying benefits on January 31, 2013.  (R. at 14-25.)  At step one, she found that Plaintiff had not engaged in substantial gainful activity since January 1, 2008, the alleged onset date.  (R. at 19.)  At step two, the ALJ found that Plaintiff had three severe impairments: major depressive disorder, anxiety disorder, and panic disorder.  (*Id*.)  Despite those impairments, at step three, she found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*.)  The ALJ next determined that Plaintiff had the RFC to perform a full range of work at all exertional levels.  (R. at 20.)  She included the following limitations and restrictions: understand[ing], remember[ing], and carry[ing ]out simple, routine and repetitive work, no work requiring production rate or pace work, such as a production line worker, no more than occasional interaction with co-workers, supervisors, and the public, and only low-stress jobs which are defined as requiring only occasional changes in decision making and occasional changes in the work setting.  (*Id*.)  At step four, the ALJ determined that Plaintiff could not perform her past relevant work as a financial aid counselor and assistant manager of an apartment complex.  (R. at 23.)  At step five, based in part on the testimony of the VE, she determined that Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy, such as a housekeeper (unskilled, SVP 2), a cafeteria attendant (unskilled, SVP 2), and a kitchen helper (unskilled, SVP 2).  (R. at 24.)  Accordingly, she determined that Plaintiff was not

disabled within the meaning of the Social Security Act at any time between her alleged onset date of January 1, 2008, and the date of her decision.  (*Id.*)

## II.  ANALYSIS

### A.  <u>Legal Standards</u>

#### 1.    Standard of Review

Judicial review of the commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(c)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.*  The Court may

rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

### 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as

defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640

(5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage

in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*,

954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant

is disabled:

> 1.      An individual who is working and engaging in substantial gainful activity
> will not be found disabled regardless of medical findings.
>
> 2.      An individual who does not have a "severe impairment" will not be found to
> be disabled.
>
> 3.      An individual who "meets or equals a listed impairment in Appendix 1" will
> not be found to be disabled.
>
> 4.      If an individual is capable of performing the work he had done in the past, a
> finding of "not disabled" must be made.
>
> 5.      If an individual's impairment precludes him from performing his work, other
> factors including age, education, past work experience, and residual
> functional capacity must be considered to determine if work can be
> performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R.

§ 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(I)-(v) (2012)).  Under the first four steps

of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564.  The

16

analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greendspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Froga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## B.    Issues for Review

Plaintiff's brief initially lists five issues for review,[3] but it later states that the "only" issues before the Court are the following two:

---

[3]The five issues are:

(1) Whether or not the Claimant is disabled pursuant to Sections 216(i), 226(d) and 16(a)3(A) of the Social Security Act.  Also, see 20 CFR 404.1520(a) and 416.920(a);

(2)Whether the Claimant has a medically determinable impairment that is severe, or a combination of impairments that are severe, pursuant to 20 CFR 404.1520(c) and 416.920(c);

(3) Whether the Claimant has an impairment or combination of impairments of such a severity to meet or medically equal the criteria of an impairment listed in 20 CFR 404(p) and whether Claimant's impairment of combination of impairments is of a severity to meet or medically equal the criteria of the listing that meets the duration requirement of 20 CFR 404.1509 and 416.909;

(4) Whether the Claimant has the residual functional capacity to do physical and mental work and activities on a sustained basis despite her limitations from her impairments.  20 CFR 404.1520(e) and 416.920(e); and

(5) Whether the Claimant is able to do any other work considering her residual functional capacity, age, education, and work experience.  20 CFR 404.1520(g) and 416.920(g).

(doc. 19 at 1-2.)

(1) whether or not Claimant meets the listings of 20 CFR 404(p) as to whether or not she has an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments, and

(2) whether or not Claimant has the residual functioning capacity to perform a full range of work in the general public without regard to past relevant work.

(*See* doc. 19 at 1-2, 6.)[4]

## C.   **Severe Impairments**

Plaintiff appears to argue that the ALJ failed to consider all of her impairments when determining whether she had medically determinable impairments at step two. (*See* doc. 19 at 1, 8.)

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4)(ii),(c) (2012). To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010). Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104–05 (5th Cir. 1985). Accordingly, to meet the severity threshold at step two, "the claimant need only . . . make a *de minimis* showing that her impairment is severe enough to interfere with her ability to do work." *Anthony v. Sullivan*, 954 F.2d 289, 294 n. 5 (5th Cir. 1992) (citation omitted). "Because a determination [of] whether an impairment[] is severe requires an assessment of the functionally

---

[4] The *Scheduling Order* dated September 26, 2013, expressly requires that issues presented for review be listed and briefed; issues not properly raised will not be addressed and may be deemed abandoned. (*See* doc. 15 at 2.)

limiting effects of an impairment[], [all] symptom-related limitations and restrictions must be considered at this step." Social Security Ruling (SSR) 96-3P, 1996 WL 374181, at *2 (S.S.A. July 2, 1996). Ultimately, a severity determination may not be "made without regard to the individual's ability to perform substantial gainful activity." *Stone*, 752 F.2d at 1104.

As noted, "[t]he claimant has the burden of proving his disability[.]" *Leggett*, 67 F.3d 558, 566 (5th Cir. 1995). "The ALJ has a duty to develop facts fully and fairly, but reversal is appropriate only if the applicant shows that he was prejudiced." *Andablo v. Astrue*, No. 3:12-CV-0560-D, 2012 WL 4893215, at *4 (N.D. Tex. Oct. 16, 2012) (Fitzwater, C.J.) (quoting *Ripley v. Chater*, 67 F.3d, 552, 557 (5th Cir. 1995)) (internal quotation marks omitted). "The ALJ's duty to investigate, though, does not extend to possible disabilities that are not alleged by the claimant or to those disabilities that are not clearly indicated on the record." *Leggett*, 67 F.3d at 566. Further, to support a remand based on a failure to fully develop the record, a disability claimant must show that the ALJ's failure to develop the record prejudiced the claimant. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000). Prejudice is established if a claimant shows that she "could and would have adduced evidence that might have altered the result" reached by the ALJ. *Id.* (citing *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)).

Here, Plaintiff argues that her medical evidence "clearly indicates a medical history of", and "an on-going pattern of treatment for", "major depressive disorder, anxiety attacks, panic attacks, mood swings, bipolar disorder, migraine headaches and an inability to be around the general public." (*Id*. at 7.)[5]

---

[5]The "Statement of the Case" section of Plaintiff's brief states that she suffers from "extended periods of paranoia", but she did not argue that there was a medical history and on-going pattern of treatment for paranoia in the argument section of her brief. (*See* doc. 19 at 3, 7.)

### 1.      Bipolar Disorder

Plaintiff first mentioned her alleged bipolar disorder in her request for review by the Appeals Council.  (R. at 13.)  She failed to mention it in her application for benefits or at the hearing before the ALJ.  Although she was diagnosed with bipolar disorder, the diagnosis was made by a Metrocare PA, and not by a physician.  (R. at 428.)  Also, the diagnosis was subsequently questioned by a Metrocare psychiatrist who noted that it may have not been accurate.  (R. at 456.)  Notably, on January 26, 2013, about three months after the diagnosis, Plaintiff reported to a Metrocare nurse that she had no history of mania. (R. at 463.)  The only other mention was by a physician at Parkland, who noted that Plaintiff had been diagnosed at Metrocare with bipolar disorder.  (R. at 452.)

There is also no evidence in the record that Plaintiff sought separate treatment for bipolar disorder.  *See Sweeten v. Astrue*, No. 3:11-CV0934-G-BH, 2012 WL 3731081 (N.D. Tex. Aug. 13, 2012) (finding no error in the ALJ's failure to consider anxiety as a severe impairment where the plaintiff failed to claim anxiety as an impairment before the ALJ, the medical records showed only an occasional display of symptoms, and she never sought treatment for anxiety).  The ALJ's failure to find Plaintiff's alleged bipolar disorder a severe impairment was not an error when Plaintiff failed to raise it before the ALJ, and the record only shows sporadic mention of the condition.  *See Andablo v. Astrue*, No. 3:12-CV-0560-D, 2012 WL 4893215 (N.D. Tex. Oct. 16, 2012) (finding that the ALJ did not err in failing to consider education or intelligence as a possible limitation when the claimant first asserted the limitation in his brief to the Appeals Council because the ALJ's duty did not extend to investigating possible disabilities not alleged by the claimant).

### 2.      Other Conditions

Nothing in the record shows that the ALJ should have considered Plaintiff's other alleged

impairments, including hallucinations, crying spells, mood swings, paranoia, migraine headaches, and general intolerance to the public.  Although Plaintiff referenced or alluded to these conditions at the hearing before the ALJ, the only condition that her attorney expressly mentioned as part of Plaintiff's "theory of [the] case" apart from major depressive disorder and anxiety was Plaintiff's fear of being around the public.  (R. at 33.)   Although the record notes Plaintiff's complaints of hallucinations, crying spells, mood swings, paranoia, and general intolerance to the public on a few occasions to her therapists, doctors, or nurses, there is no mention in the record of Plaintiff being diagnosed with these conditions or receiving separate treatment for them.  Rather, these conditions appear sporadically in the record as side effects of Plaintiff's medication and as symptoms of her depression, anxiety, and panic attacks.  (R. at 291, 306, 423, 425, 427, 428 456, 460.)  While the SAMC noted that Plaintiff had issues with sadness and paranoia, no examining physician or psychiatrist imposed any limitation or restriction on Plaintiff as a result of any of these conditions. With regard to her migraine headaches, Plaintiff's attorney expressly represented at the hearing before the ALJ that Plaintiff was not alleging any physical impairments, and that Plaintiff had no disabling physical impairments.  (R. at 34.)   The ALJ's failure to find Plaintiff's alleged hallucinations, crying spells, mood swings, paranoia, migraine headaches, and general intolerance to the public as severe impairments was not error.  *See Lopez. v. Astrue*, 845 F. Supp.2d 415, 426 (N. D. Tex. 2012) (finding no error in ALJ's failure to consider plaintiff's bilateral inguinal hernias as impairments because there was no mention in record of treatment received by plaintiff for the hernias or their effect on plaintiff, and because no physician imposed any limitation or restriction on plaintiff as a result of the hernias); *Mack v. Comm'r of Social Sec. Admin*, No. 3:06-cv-851-B(BH), 2008 WL 555366, at *8 (N.D.Tex. Feb.29, 2008)(finding no error in ALJ's failure to

consider pelvic instability, torn knee ligaments, and flat feet as severe impairments because plaintiff was not diagnosed with any of these conditions and each of the conditions was mentioned only once by medical staff as the treating facility).

**D**.      **Listings in 20 CFR § 404(p)**

Plaintiff contends that the ALJ erred in finding that Plaintiff's severe mental impairments do not meet the listings outlined in 20 CFR § 404(p).  (doc. 19 at 3.)[6]

The listed impairments in the Social Security regulations "are descriptions of various physical and mental illnesses . . . most of which are categorized by the body system they affect." *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990).  "Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results."  *Id.* at 530.  Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, as described by an appropriate medical source.  20 C.F.R. Pt. 404, Appendix 1, Subpt. P § 12.00(B). The claimant bears the burden of proving that his impairments meet or equal the criteria found within the Listings.  *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).  To meet a listed impairment, the claimant's medical findings, *i.e.*, symptoms, signs and laboratory findings, must match those described in the listing for that impairment.  20 C.F.R. §§ 404.1525(d), 404.1528; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  To equal a listing, the claimant's medical finding must be "at least equal in severity and duration to the listed findings."  20 C.F.R. § 404.1526(a).  Deter- minations of equivalence must be based on medical evidence only and must be supported by

---

[6]Plaintiff appears to argue that the medical evidence supports that she has been suffering a disability since her disability onset date in 2008.  (doc. 19 at 7.)  To the extent that she is making this argument, her onset date is not at issue because the ALJ found that Plaintiff was not disabled, and his determination did not turn on the duration of Plaintiff's impairments.

medically acceptable clinical and laboratory diagnostic techniques. *Id.* § 404.1526(b). If a claimant fails to meet the burden, the ALJ's finding is supported by substantial evidence. *Henson v. Barnhart*, 373 F. Supp. 2d. 674, 685 (E.D. Tex. 2005) (citing *Selders*, 914 F.2d at 620).

Here, the ALJ found that Plaintiff's major depressive disorder, anxiety disorder, and panic disorder did not meet or medically equal the criteria of listings 12.04 and 12.06, considered singly and in combination. (R. at 19.) Listing 12.04 (Affective Disorders) states:

Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B[7] are satisfied,

---

[7]A. Medically documented persistence, either continuous or intermittent, of one of more of the following:
    1. Depressive syndrome characterized by at least four of the following:
        a. Anhedonia or pervasive loss of interest in almost all activities; or
        b. Appetite disturbance with change in weight; or
        c. Sleep disturbance; or
        d. Psychomotor agitation or retardation; or
        e. Decreased energy; or
        f. Feelings of guilt or worthlessness; or
        g. Difficulty concentrating or thinking; or
        h. Thoughts of suicide; or
        i. Hallucinations, delusions, or paranoid thinking; or
    2. Manic syndrome characterized by at least three of the following:
        a. Hyperactivity; or
        b. Pressure of speech; or
        c. Flight of ideas; or
        d. Inflated self-esteem; or
        e. Decreased need for sleep; or
        f. Easy distractibility; or
        g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
        h. Hallucinations, delusions or paranoid thinking; or
    3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
  B. Resulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.

or when the requirements in C[8] are satisfied.

Listing 12.06 states:

> Anxiety Related Disorders: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.[9]

---

"Marked" means more than moderate but less than extreme. *Id.* § 12.00(C). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." *Id.*

[8]C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
    1. Repeated episodes of decompensation, each of extended duration; or
    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Appendix 1, Subpt. P § 12.04.

[9]A. Medically documented findings of at least one of the following:
    1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
        a. Motor tension; or
        b. Autonomic hyperactivity; or
        c. Apprehensive expectation; or
        d. Vigilance and scanning; or
    2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
    3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
    4. Recurrent obsessions or compulsions which are a source of marked distress; or
    5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.
B. Resulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.
C. Resulting in complete inability to function independently outside the area of one's home.

As noted, the ALJ concluded that Plaintiff's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04 and 12.06. (R. at 20.) She found that the "paragraph B" criteria were not satisfied because Plaintiff had a mild restriction in activities of daily living, moderate difficulties in social functioning and concentration, persistence or pace, and no extended episodes of decompensation. (*Id.*) She stated that the evidence failed to establish the presence of the "paragraph C" criteria. (*Id.*)

Plaintiff has failed to show that she met the 12.04 and 12.06 listings. She has not shown marked restrictions or difficulties in activities of daily living, maintaining social functioning or in maintaining concentration, persistence, or pace. She testified that she went to the grocery store, got around by walking, watched TV, and used the internet to apply for jobs and play games. (R. at 35,54.)   As the ALJ points out, she indicated on her Function Report that she prepared meals, cleaned the house, showered, cleaned laundry, and shopped in stores. (R. at 201-202.) She also testified that she spent time with her sister, talked on the phone, and traveled to Amarillo for her daughter's graduation. (R. at 48-49.) The record reflected that Plaintiff presented herself appropriately dressed and groomed with her thought-process intact and her speech and affect normal. (R. at 283, 424, 427, 455-56, 464.) Although Plaintiff testified that she would not be able to comprehend instructions on a job, she was able to comprehend the ALJ's questions at the hearing. She was also able to verbally communicate her thoughts to the ALJ and her attorney. There is also nothing in the record to reflect that Plaintiff experienced any periods of decompensation. There is no evidence that Plaintiff was ever admitted to a psychiatric hospital or facility. The record reflects that Plaintiff was able to function independently at her home and outside of her home.

Additionally, no doctor testified that Plaintiff was disabled as a result of her major depressive

order, anxiety disorder, and panic disorder.  She testified that her Hydroxyzine medication "really, really" helped with her anxiety and panic attacks, and the record reflects that Plaintiff was at least "moderately well" when she complied with her medication regime.  (R. at 42, 428.)  Notably, the ALJ's findings are consistent with the SAMC's RFC assessment, which found that Plaintiff was only markedly limited in her ability to understand,  remember, and carry out detailed instructions.  (R. at 327.)

Plaintiff failed to show that her major depressive disorder, anxiety disorder, and panic disorder meet or medically equal the criteria of any of the listed impairments, and the ALJ's decision is supported by substantial evidence.  *See Graham v. Barnhart*, 122 Fed. Appx. 104, 105 (5th Cir. Jan. 26, 2005) (finding the ALJ's decision that plaintiff's depression did not meet or equal the criteria of any of the listed impairments was supported by substantial evidence because (1) the ALJ was not required to give precedence to subjective evidence over objective evidence which showed plaintiff's depression was not disabling; (2) no doctor testified that plaintiff was disabled as a result of his alleged depression; (3) plaintiff's testimony regarding his daily activities was inconsistent with his claimed limitations; and (4) medical records showed that plaintiff was prescribed medication to which he responded well).

**E.** **RFC**

Plaintiff argues that the ALJ erred in finding that she had the RFC to perform a full range of work in the general public despite her limitations from her impairments.  (doc. 19 at 2, 8.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and

26

continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence". *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, the ALJ found that Plaintiff has the RFC to perform a full range of work at all

exertional levels with the following limitations and restrictions: understand[ing], remember[ing], and carry[ing] out simple, routine and repetitive work, no work requiring production rate or pace work, such as a production line worker, no more than occasional interaction with co-workers, supervisors, and the public, and only low-stress jobs which are defined as requiring only occasional changes in decision making and occasional changes in the work setting.  (R. at 20.)  In making her determination, she considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p."  (*Id*.)  She found that the RFC was supported by the objective medical evidence of record, which lacked objective support for Plaintiff's subjective complaints and reflected a positive response to treatment with compliance.  (R. at 23.)  She also found that the RFC was supported by Plaintiff's demonstrated ability to maintain an active lifestyle.  (*Id*.)

The ALJ expressly considered Plaintiff's major depressive disorder, anxiety disorder, and panic disorder.  She noted Plaintiff's testimony that she suffered from depression and anxiety and experienced two to three panic attacks per week.  (R. at 21.)  However, she also noted Plaintiff's pattern of noncompliance with her prescribed medications.  (*Id*.)  Specifically, she mentioned Plaintiff's admission that she did not take her anti-anxiety medications regularly, but only when she really needed them.  (*Id*. at 21-22.)  The ALJ noted that the record reflected that Plaintiff had stopped taking her medication in November 2010, July 2011, and September 2011.  (R. at 22.)  She highlighted the fact that despite Plaintiff's alleged disabling depression and anxiety, she never required psychiatric hospitalizations.  (R. at 22.)  She also highlighted Plaintiff's testimony that she would never commit suicide. (*Id*.)

Also, the ALJ expressly considered Plaintiff's alleged intolerance and fear of the general public.  She noted Plaintiff's testimony that she could not tolerate being around others, she could not communicate with others, she had impaired focus and poor comprehension, and she had difficulty with task completion. (R. at 21.)  The ALJ noted Plaintiff's admitted activities of daily living, including using the internet to apply for jobs, walking, smoking half of a pack of cigarettes daily, talking on the phone, watching television, playing computer games, preparing meals, cleaning the house, shopping, and doing laundry. (R. at 21-22.)  The ALJ found that the performance of these activities was not inconsistent with the performance of many of the basic activities of work, and they demonstrated a higher level of functioning than Plaintiff asserted.  (R. at 22.)

The ALJ expressly considered Plaintiff's hallucinations.   She noted that Plaintiff's medications allegedly caused her to have severe hallucinations, migraines, and vaginal bleeding. (R. at 21.)  She also noted that they made her sleep.  (R. at 22.)  Despite those side effects, the ALJ pointed out that her review of the medical evidence reflected that Plaintiff responded well to the medications when she took them as prescribed.  (*Id.*)

Although she did not specifically mention Plaintiff's crying spells and mood swings, she noted that upon compliance with her medication regime, Plaintiff's mental status examinations revealed a euthymic mood, normal psychomotor behavior, intact memory, normal attention, and organized and coherent thoughts.  (*Id.*)  The ALJ also mentioned that a review of the medical record revealed that Plaintiff's symptoms were largely the result of "situation stress ste[]ming from financial difficulties, [an] abusive relationship, and housing issues.  (*Id.*)

The ALJ did not mention Plaintiff's complaints and symptoms of paranoia or her diagnosed bipolar disorder.  However, she did state that she considered all of Plaintiff's symptoms and she

considered the entire case record in making her decision.  (R. at 20-21.)  Nevertheless, even if the ALJ did not consider Plaintiff's alleged paranoia or bipolar disorder, because an RFC determination can be supported by substantial evidence even if the ALJ does not specifically discuss all the evidence that she rejected, Plaintiff must show that she was prejudiced by the ALJ's failure to consider her alleged paranoia and her bipolar disorder.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam) (holding that because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected"); *see also Falco*, 27 F.3d at 164.

"Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).  To establish prejudice warranting remand, Plaintiff must show that consideration of the evidence relating to Plaintiff's symptoms of paranoia and her bipolar diagnosis might have led to a different decision of disability.  *See Newton*, 209 F.3d at 458; *McNair*, 537 F. Supp. 2d at 837.

Here, Plaintiff's complaints of paranoia were always expressed in conjunction with her reports of depression and anxiety as well as the other symptoms she experienced.  (R. at 306, 456, 460.)  There is no record of any symptoms Plaintiff experienced as a result of her alleged bipolar disorder that were distinct from the symptoms associated with her major depressive disorder, anxiety disorder, or panic disorder.  As noted, the ALJ considered at length Plaintiff's depression, anxiety, and associated symptoms in making her RFC determination.

Moreover, in making her decision, the ALJ relied heavily on Plaintiff's demonstrated ability

to maintain an active lifestyle as well as her positive response to the medication when she was compliant with her medication regimen.  (R. at 23.)  She also relied on the absence of a disability determination from any doctor as well as Plaintiff's failure to seek consistent treatment for any of her symptoms.  (R. at 21, 23.)  The ALJ noted that the record was void of any opinions from a treating or examining physician indicating that Plaintiff was disabled, and she noted that the conclusions reached by the SAMC supported a finding of "not disabled." (R. at 23.)  She further noted that the records from Metrocare reflected that Plaintiff sought sporadic treatment since January 2008.  (R. at 21.)  The ALJ found that if Plaintiff's symptoms were not severe enough to motivate her to seek treatment on a "regular and continuous basis," it became more difficult to accept her allegations that the symptoms impeded her ability to work.  (*Id*.)  The ALJ's RFC determination is supported by substantial evidence.  To the extent the ALJ did not consider Plaintiff's alleged paranoia and bipolar disorder, Plaintiff has not shown that consideration of these conditions that were so closely related to her depression, anxiety, and other symptoms, would have altered the outcome.

## III.   CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED on this 30th day of September, 2014.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE